# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Lois H. Goodman |
| | : | |
| v. | : | Mag. No. 20-5025 |
| | : | |
| LINDA MIKA, | : | **CRIMINAL COMPLAINT** |
| KENNETH MIKA, and | : | |
| PAUL MIKA | : | |

I, Peter DeRado, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent of the United States Department of Defense, Office of the Inspector General, Defense Criminal Investigative Service, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

s/Peter DeRado<br>
Peter DeRado Special Agent<br>
U.S. Department of Defense<br>
Office of Inspector General<br>
Defense Criminal Investigative Service

Sworn to and subscribed
by telephone in my presence

July 28, 2020 at
Trenton, New Jersey

_____
HONORABLE LOIS H. GOODMAN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

From at least as early as in or around March 2017 through in or around February 2020, in the District of New Jersey, and elsewhere, the defendants,

**LINDA MIKA,
KENNETH MIKA, and
PAUL MIKA,**

did knowingly and intentionally conspire and agree with each other and others to devise a scheme and artifice to defraud the United States, and others, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals, and sounds, including but not limited to, the wire transactions set forth below and as further described in Attachment B:

| Approximate Dates | Description of Interstate Wire Transmission |
|---|---|
| March 24, 2017 | Bid for the award of a Department of Defense ("DoD") contract submitted through the DoD Defense Logistics Agency Internet Bid Board System ("DIBBS") from a server in New Jersey to the DIBBS server in Columbus, Ohio. |
| October 17, 2018 | Bid for the award of a DoD contract submitted through DIBBS from a server in New Jersey to the DIBBS server in Columbus, Ohio. |
| January 8, 2019 | Bid for the award of a DoD contract submitted through DIBBS from a server in New Jersey to the DIBBS server in Columbus, Ohio. |

Contrary to Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Peter DeRado, am a Special Agent of the Department of Defense, Office of Inspector General ("OIG"), Defense Criminal Investigative Service ("DCIS"). I have knowledge about the facts set forth below from my involvement in the investigation, my review of reports, documents, pictures, witness interviews, and discussions with other law enforcement officials. Because this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact that I know concerning this investigation. All statements described herein are relayed in substance and in part. In addition, where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## RELEVANT INDIVIDUALS AND ENTITIES

1. At all times relevant to this Complaint:

    a. DoD was the United States government agency charged with providing the military forces needed to deter war and to protect the security of the United States.

    b. The Defense Logistics Agency ("DLA") was a combat logistic support arm of the DoD, which managed the global supply chain for the United States Armed Forces, through, among other responsibilities, acquiring weapons, fuel, repair parts, and other materials.

    c. Monmouth Marine Engines, Inc. ("Monmouth Marine") was a maritime equipment and servicing facility located in Monmouth County, New Jersey, which, among other services, entered into contracts with DLA to supply DoD contracting entities with replacement parts for Naval vessels.

    d. Defendant Linda Mika ("LINDA MIKA") was employed by Monmouth Marine, and was responsible for, among other things, reviewing and submitting bids on DIBBS for the award of DLA contracts. Upon the award of DLA contracts to Monmouth Marine, defendant LINDA MIKA oversaw and participated in the sourcing of products to fulfill those contracts.

    e. Defendant Kenneth Mika ("KENNETH MIKA"), defendant LINDA MIKA's son, was employed by Monmouth Marine, and was responsible for, among other things, reviewing and submitting bids on DIBBS for the award of DLA contracts. Upon the award of DLA contracts to Monmouth Marine, defendant KENNETH MIKA oversaw and participated in the sourcing of products to fulfill those contracts.

  f. Defendant Paul Mika ("PAUL MIKA"), defendant LINDA MIKA's husband and defendant KENNETH MIKA's father, was the founding owner of Monmouth Marine, and was responsible for overseeing Monmouth Marine's business activities, including its servicing of DLA contracts.

  g. "Indiana Company" was a corporation headquartered in Columbus, Indiana, that manufactured and designed diesel and gas-powered engines and their components.

  h. "Georgia Company" was a corporation headquartered in Suwanee, Georgia, that manufactured and distributed service parts to the heavy-duty truck industry.

  i. "Ohio Company" was a corporation headquartered in Cleveland, Ohio, that manufactured aftermarket replacement parts for name-brand engine applications.

## **OVERVIEW OF THE CONSPIRACY**

  2. Beginning at least in or around March 2017 and continuing through in or around February 2020, defendants LINDA MIKA, KENNETH MIKA, and PAUL MIKA (collectively, the "DEFENDANTS"), did knowingly and intentionally conspire and agree with each other and others to defraud DLA and DoD by engaging in a pattern of unlawful product substitution. As set forth in greater detail below, the defendants submitted electronic bids, also known as "quotations" or "quotes," for the award of DLA contracts, falsely representing in the bids that Monmouth Marine would provide, as required by the contracts, specific and unique replacement parts manufactured by specific entities.

  3. However, once awarded the contracts by DLA, the DEFENDANTS knowingly and intentionally sourced unauthorized and cheaper replacement parts without notifying DLA of their plan to substitute the alternative parts for the required replacement parts. By furtively substituting cheaper replacement parts for the contractually-required parts, the DEFENDANTS (i) increased Monmouth Marine's profit margin; (ii) unfairly suppressed fair competition for the award of DLA contracts; and (iii) deceived the downstream purchasers of the replacement parts, who believed they were receiving the parts identified in the DLA contracts.

  4. Further, the DEFENDANTS routinely delivered the substitute replacement parts to DLA in packaging that disguised the parts' identity in an effort to deceive the unwitting government purchasers. By engaging in this conspiracy to deliver cheaper, substitute replacement parts without the purchasers' notice, the DEFENDANTS unjustly enriched themselves, while exposing DLA's military customers to harm.

## **MANNER AND MEANS OF THE CONSPIRACY**

5.  The manner and means by which the DEFENDANTS and their co-conspirators sought to accomplish the conspiracy included, among other things, the following:

a.  DIBBS was a web-based application that allows users to search and view Requests for Quotations ("RFQs") and other procurement information related to DLA. An RFQ, also referred to as a "solicitation," specifies various criteria to potential defense contractors, including but not limited to the exact part sought for purchase, the quantity of parts needed, and the required delivery date for the parts. DIBBS provided the capability for contractors to search for, view, and submit secure bids in response to RFQs for items DLA is seeking to procure for its military customers. The DIBBS server was located in Columbus, Ohio.

b.  Contractors like Monmouth Marine seeking to do business with the DoD electronically, including those that wished to provide replacement parts sourced from others, were required to submit a request for a Commercial and Government Entity ("CAGE") code, which is a five-character unique identifier assigned to entities doing business with the federal government. Using the CAGE code, prospective contractors could access DIBBS electronically and submit a bid responsive to a given RFQ. DLA evaluated these bids and awarded contracts often based predominately upon the price quoted on DIBBS. From locations in New Jersey, the DEFENDANTS utilized DIBBS to submit secure quotations for the awarding of DLA contracts. The RFQs on which the DEFENDANTS bid, as well as the purchase orders which resulted from contracts awarded to Monmouth Marine as a result of those bids, specified the exact part, quantity, and delivery date required under the contract.

c.  Once the DEFENDANTS submitted bids on DIBBS, DLA analyzed the competing bids and made an award to the winning contracting entity. In awarding the contract, DLA relied on the representations made by the DEFENDANTS and their competitors in each party's bid.

d.  On numerous contracts, the DEFENDANTS submitted bids on DIBBS under defendant KENNETH MIKA's CAGE Code User ID: 48CG901. In that portion of the RFQ captioned: "Product Offered Representations," the DEFENDANTS provided a CAGE Code for an "Exact Product." By submitting the bid in this manner, the DEFENDANTS represented that Monmouth Marine would be furnishing DLA with a particular and uniquely identifiable product, from a specific manufacturer, and would not be substituting any other product to fulfill the contract.

e.      In connection with Monmouth Marine's efforts to secure an Exact Product contract, defendant LINDA MIKA frequently sought out and corresponded with manufacturers in an effort to obtain non-conforming replacement parts that were significantly cheaper than the "Exact Product" that Monmouth Marine agreed to provide, and represented to DLA that it would provide under the contract.

f.      As part of their internal accounting and business records, the DEFENDANTS maintained "Control Tickets," which were documents designed to track the order and receipt of parts intended to fulfill DLA contracts.  The first line of a Control Ticket regarding Monmouth Marine's DLA contracts ordinarily identified the part number, manufacturer, and unit price of the Exact Product.  In cases where the DEFENDANTS substituted non-conforming replacement parts for the Exact Product, those unauthorized replacement parts, similarly identified by part number, manufacturer and unit price, were typically listed on the Control Ticket under the Exact Product.  The defendants would list both approved and unapproved parts on the same Control Ticket, thereby reflecting not only price differences, but also the per-contract profit realized by the product substitution scheme.

g.      In order to pass off the non-conforming replacement parts as the "Exact Product" required under the contract, the DEFENDANTS disguised, and directed others to disguise, the identity of the substituted products by shipping them in packaging in a way that masked their origin.  DLA's customers, who were unaware that Monmouth Marine was not providing the Exact Product as listed on the RFQ and in the purchase orders, ultimately were deceived by the product substitution scheme.

## **CONDUCT IN FURTHERANCE OF THE CONSPIRACY**

6.    In furtherance of the conspiracy, the DEFENDANTS, and others known and unknown, committed the following acts, among others:

### A. Contract # SPE7MC-17-V-6096

7.    On or about March 22, 2017, DLA issued RFQ # SPE7MC-17-T-E509 for 50,000 non-metallic hoses, identified by National Stock Number ("NSN") 4720-01-642-5128, manufactured by Indiana Company, and listed under part number A034W175.

8.    On or about March 24, 2017, defendant KENNETH MIKA, on behalf of Monmouth Marine, submitted a quotation to provide the approved Indiana Company hoses at a unit price of $2.75, and a total contract price of $137,500.

9.  On or about April 3, 2017, DLA awarded Contract # SPE7MC-17-V-6096 to Monmouth Marine for 50,000 non-metallic hoses at a total contract price of $137,500. Several contractors with higher bids were not awarded the contract.

10. Monmouth Marine's DIBBS "Submitted Quote Summary" acknowledged the following: "You have stated that the part number offered for NSN/Part # **4720016425128** is an 'exact product'. **Exact product means CAGE XXX[1] P/N A034W175: manufactured by, under the direction of, or under agreement with CAGE XXX.** Any product not meeting these criteria is considered an alternate product even though it may be manufactured in accordance with the drawings and/or specifications of CAGE XXX. . . . Any indication that you have misrepresented the product offered shall result in the Government considering rescission of any resultant contract and all other sanctions, contract penalties, and remedies established under any other law or regulation."

11. Following the award of the DLA contract to Monmouth Marine, the DEFENDANTS knowingly and intentionally ordered spools of hose from a non-conforming supplier, instead of purchasing the Indiana Company hose as represented on Monmouth Marine's bid for the contract.

12. To track information on vendors from whom the DEFENDANTS sought to purchase non-conforming products, the DEFENDANTS made entries in a Google Calendar application referencing two manufacturers of hose that did not conform to the Exact Product specifications in the contract. On July 20, 2017, defendant LINDA MIKA made a Google Calendar entry indicating that one of these two non-conforming vendors was preparing to provide Monmouth Marine with 18,000 units of hose.

13. The DEFENDANTS purchased spools of non-conforming hose from this unapproved vendor. In an effort to pass off the non-conforming hose as the Exact Product required under the contract, defendant KENNETH MIKA asked several Monmouth Marine employees to cut the spools into multiple seven-inch lengths of hose, as required under the contract. The cutting of the spool resulted in the creation of thousands of separate hoses of uneven length.

14. The DEFENDANTS then delivered to DLA the 50,000 non-conforming hoses, packaging them in shipping parcels that bore a bogus label masking the non-conforming origin of the hose.

---

[1] In order to anonymize the manufacturers of the products at issue, CAGE numbers have been omitted and replaced by "XXX."

### B. Contract # SPE5EM-19-V-1073

15. On or about October 15, 2018, DLA issued RFQ # SPE5EM-19-T-0538 for 89 gasket sets, identified by NSN: 5330-01-344-0567, manufactured by Indiana Company, and listed under part number 3800558.

16. On or about October 17, 2018, defendant KENNETH MIKA, on behalf of Monmouth Marine, submitted a quotation to provide the approved Indiana Company gasket sets at a unit price of $257.20, and a total contract price of $22,890.80.

17. On or about November 21, 2018, DLA awarded Contract # SPE5EM-19-V-1073 to Monmouth Marine for 89 Indiana Company gasket sets at a total price of $22,860.54. Several contractors with higher bids were not awarded the contract.

18. Monmouth Marine's DIBBS Submitted Quote Summary acknowledged the following: "You have stated that the part number offered for NSN/Part # **5330013440567** is an 'exact product'. **Exact product means CAGE XXX P/N 3800558: manufactured by, under the direction of, or under agreement with CAGE XXX**. Any product not meeting these criteria is considered an alternate product even though it may be manufactured in accordance with the drawings and/or specifications of CAGE XXX . . . . Any indication that you have misrepresented the product offered shall result in the Government considering rescission of any resultant contract and all other sanctions, contract penalties, and remedies established under any other law or regulation."

19. Thereafter, the DEFENDANTS generated a Control Ticket listing 89 Indiana Company gasket sets at a unit price of $256.86 on the top line, for a total price of $22,860.54. Underneath this line item, the Control Ticket reflected several non-conforming parts, including Georgia Company part number 131408, listed under purchase order number 12658 at a unit price of $75.

20. Additionally, Monmouth Marine's Google Calendar application reflected several entries listing non-conforming substitute parts obtainable at a discount to the unit price for the Indiana Company gasket sets required under the contract. One such entry indicated that Monmouth Marine could purchase a gasket set from Georgia Company at a unit cost of $80.36. On or about November 28, 2018, defendant LINDA MIKA made an entry in Google Calendar quoting a discounted price available to Monmouth Marine were it to purchase the gasket sets from Georgia Company in bulk. The note referenced purchase order number 12658.

21.     On or about January 9, 2019, defendant PAUL MIKA signed purchase order 12658, confirming Monmouth Marine's purchase of 89 non-conforming gasket sets from Georgia Company for a total cost of $6,675.  The DEFENDANTS input the following entry on Google Calendar: "LMM ORDERED PO 12658," a reference to defendant LINDA MIKA's order of the Georgia Company's non-conforming gasket sets.

22.     The Google Calendar notes further included several references to emails exchanged between defendant LINDA MIKA and a representative of Georgia Company concerning purchase order 12658, as well as internal emails between defendants LINDA and PAUL MIKA, also concerning this purchase order.

23.     Upon receipt of the non-conforming, Georgia Company gasket sets, Monmouth Marine packaged the non-conforming substitute parts and delivered them to DLA.

### C. Contract # SPE5EJ-19-V-2256

24.     On or about January 7, 2019, DLA issued RFQ # SPE5EJ-19-T-2690 for 412 gasket valve covers, identified by NSN 5330-01-143-8208, manufactured by Indiana Company, and listed under part number 3028673.

25.     On or about January 8, 2019, defendant KENNETH MIKA, on behalf of Monmouth Marine, submitted a quotation to provide the Indiana Company gasket valve covers at a unit price of $28.98, and a total contract price of $11,939.76.

26.     On or about January 14, 2019, DLA awarded Contract # SPE5EJ-19-V-2256 to Monmouth Marine for 412 gasket valve covers at a total price of $11,939.76.  Several contractors with higher bids were not awarded the contract.

27.     Monmouth Marine's DIBBS Submitted Quote Summary acknowledged the following:  "You have stated that the part number offered for NSN/Part # **5330011438208** is an 'exact product'.  **Exact product means CAGE XXX P/N 3028673: manufactured by, under the direction of, or under agreement with CAGE XXX.**  Any product not meeting these criteria is considered an alternate product even though it may be manufactured in accordance with the drawings and/or specifications of CAGE XXX . . . . Any indication that you have misrepresented the product offered shall result in the Government considering rescission of any resultant contract and all other sanctions, contract penalties, and remedies established under any other law or regulation." (emphasis in original).

28.     On or about January 15, 2019, the defendants generated a Control Ticket listing 412 Indiana Company gasket valve covers at a unit price of $28.98 on the top line, for a total price of $11,939.76.  Underneath this line item, the Control Ticket listed two non-conforming parts and their prices – a Georgia Company part at a unit price of $8.48 and an Ohio Company part at a unit price of $7.50.

29.     On or about February 14, 2019, defendant LINDA MIKA, using the email address: [monmouthmarine@aol.com](mailto:monmouthmarine@aol.com), corresponded with an employee of the Ohio Company, and requested a price quote for a bulk order of 412 gasket valve covers from that company.  Defendant LINDA MIKA also made an entry on Google Calendar referencing her correspondence with the Ohio Company employee.

30.     On February 19, 2019, defendant LINDA MIKA placed the order for the Ohio Company gasket valve covers.

31.     Upon receipt of the non-conforming products, the DEFENDANTS delivered to DLA 412 non-conforming valve gasket covers from the Ohio Company.